UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHIL DAVID WIZAR,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A BERRYHILL, Acting Commissioner of Social Security,<br><br>Defendant. | Case No. 2:17-cv-01843-KES<br><br>MEMORANDUM OPINION AND ORDER |

Plaintiff Phil David Wizar ("Plaintiff") appeals the final decision of the Social Security Commissioner denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons discussed below, the Commissioner's decision is AFFIRMED.

**I.**

**BACKGROUND**

Plaintiff filed his DIB application on March 12, 2014. Administrative Record ("AR") 130. He later alleged a disability onset date of March 13, 2014. AR 30. Plaintiff met the disability insured status requirements of the Social Security Act as of his alleged disability onset date, and was insured through March 31, 2015. AR 17, 156-59.

1

1    The Commissioner denied the application initially, and in September 2014, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 83-84. On May 20, 2016, the ALJ conducted a hearing at which Plaintiff, who was represented by an attorney, appeared and testified. AR 27-65. The ALJ issued an unfavorable decision on June 23, 2016. AR 12-26.

The ALJ found that Plaintiff suffers from the severe impairment of seizure disorder. AR 17. Despite this impairment, the ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform work at all exertional levels, but restricted him against climbing, working at unprotected heights, working with moving machinery, and driving. AR 19.

Based on this RFC and the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform his past relevant work as an assistant retail manager, meat clerk, stock clerk, small products assembler, and bagger, because these jobs do not require tasks potentially hazardous to someone prone to seizures. AR 21. The ALJ therefore concluded that Plaintiff was not disabled. AR 22.

## II.

## PROCEDURES AND STANDARDS

**A.     The Evaluation of Disability.**

A person is "disabled" for purposes of receiving Social Security benefits if he is unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992). A claimant for disability benefits bears the burden of producing evidence to demonstrate that he was disabled within the relevant time period. Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

/ / /

/ / /

**B.      The Five-Step Evaluation Process.**

The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lester v. Chater, 81 F.3d 821, 828 n. 5 (9th Cir. 1996). In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, the claimant is not disabled and the claim must be denied. Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded. Id. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity to perform his past work; if so, the claimant is not disabled and the claim must be denied. Id. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). The claimant has the burden of proving he is unable to perform past relevant work. Drouin, 966 F.2d at 1257. If the claimant meets that burden, a prima facie case of disability is established. Id.

If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because he can perform other substantial gainful work available in the

1 | national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). That
2 | determination comprises the fifth and final step in the sequential analysis. Id.
3 | §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

**C.     Standard of Review.**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The ALJ's findings and decision should be upheld if they are free from legal error and are supported by substantial evidence based on the record as a whole. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007). Substantial evidence means such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla, but less than a preponderance. Lingenfelter, 504 F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006)). To determine whether substantial evidence supports a finding, the reviewing court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). "If the evidence can reasonably support either affirming or reversing," the reviewing court "may not substitute its judgment" for that of the Commissioner. Id. at 720-21.

"A decision of the ALJ will not be reversed for errors that are harmless." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). Generally, an error is harmless if it either "occurred during a procedure or step the ALJ was not required to perform," or if it "was inconsequential to the ultimate nondisability determination." Stout v. Comm'r of SSA, 454 F.3d 1050, 1055 (9th Cir. 2006).

///
///
///

4

# III.
# ISSUES PRESENTED

<u>Issue One</u>: Whether the ALJ erred in rejecting Plaintiff's testimony regarding his subjective symptoms and functional limitations associated with his seizure disorder.

<u>Issue Two</u>: Whether the ALJ erred in the evaluation of the medical evidence concerning Plaintiff's seizure disorder under Neurological Listing 11.03.

<u>Issue Three</u>: Whether the ALJ failed to account adequately for the effects of Plaintiff's seizures in the residual functional capacity determination.

(Dkt. 20, Joint Stipulation ["JS"] at 3).[1]

# IV.
# SUMMARY OF THE EVIDENCE

The Court provides the following chronology summarizing Plaintiff's relevant work history and medical records.

- <u>1982 or 1983</u>: At age nine, Plaintiff was diagnosed with a seizure disorder and began taking anti-seizure medication. AR 228 (medical history reported in 2014).

- <u>2005</u>: At age thirty-two, Plaintiff received a vagus nerve stimulator ("VNS"), an implanted device that helps prevent seizures by sending regular electrical pulses to the brain via the vagus nerve. Id.

- <u>2006</u>: Later medical records reference appointments with treating neurologist, Ronald B. Ziman, M.D., in May and August of 2006. AR 204.

- <u>May 7, 2008</u>: After last being seen in 2006, Plaintiff returned to Dr. Ziman. Id. He reported losing his 15-year job at Ralphs two months prior and consequently losing his health insurance benefits. AR 39, 204. He reported that he was seizure free since "around" January 2006 and had a valid driver's license. AR 204.

---

[1] For ease of discussion, the Court changed the order of the issues presented.

5

Dr. Ziman refilled his anti-seizure medication and recommended that he have his VNS "checked and potentially adjusted." Id. Dr. Ziman also recommended that he not work "to the point of sleep deprivation which is a trigger for his seizures." AR 206.

- April 24, 2009: Plaintiff next visited Dr. Ziman about a year later because he had a seizure at work. AR 201-03. Three weeks earlier, he had obtained a part-time position as an assembler at Hydraulics International, but it required him to rise at 5:00 a.m. and report to work by 6:00 a.m. AR 36-37, 201. He was still actively looking for a full-time job with benefits. AR 201. Dr. Ziman again recommended that he get his VNS checked. Id. Dr. Ziman adjusted his medications, scheduled a follow-up appointment, and cleared him to return to work, so long as he did not operate "press machines." AR 203, 207.

- 2009-2012: Plaintiff lived in Ireland. AR 223. He taught martial arts six hours/day for two to three months for compensation. AR 49-50. He did not have a treating neurology doctor there. AR 226. Instead, his wife, a nurse, had a doctor friend who wrote him prescriptions for his anti-seizure medication. AR 55, 226.

- 2012: Plaintiff separated from his wife, such that he was no longer able to obtain prescription anti-seizure medication without a doctor visit. AR 223. He completed a year of college in September 2012. AR 165.

- May 2013: Plaintiff was fired from a job at Home Depot after a seizure that caused him to throw toilet paper and slam doors. AR 41, 164, 249, 292.

- July 19, 2013: Plaintiff began visiting Olive View Medical Center ("Olive View") seeking refills of his seizure medication. AR 18, 340-41. At that time, he told his doctors that he had been in Ireland and "didn't have meds x 6 mo." AR 341. Those notes indicate Plaintiff was experiencing seizures either once a month or once a week, depending on how often he was taking medication. Id. He was referred to neurology "to continue to monitor [his] seizures and refill [his] medications." AR 340.

6

- March 13, 2014: Plaintiff's alleged disability onset date (AR 30) corresponds with a visit in March 2014 to Olive View. AR 232. Plaintiff reported that he was "out" of his anti-seizure medication, Lamictal, as of the beginning of March, such that he had been off medications about 1½ weeks. AR 235. He also reported that his last seizure occurred on March 5, 2014, and he also had a seizure about one month earlier while getting off the bus, causing him to fall and bruise his face. Id. He reported that he was taken to Northridge Hospital after that fall, but there are no records from Northridge Hospital in the administrative record. Id. The Olive View staff scheduled an April follow-up appointment. AR 237. They also gave him a four-week schedule for building up his Lamictal dosages. AR 239.

- April 11, 2014: Plaintiff attended his follow-up appointment at Olive View. AR 226. He stated that between 2012 and 2014, he was only taking Lamictal "sporadically," and he also acknowledged that when he was not compliant with the Lamictal, he would have a seizure every two or three months. Id. Olive View continued his Lamictal prescription and advised Plaintiff "on the importance of being compliant." AR 228.

- June 10, 2014: Plaintiff again visited Olive View for medication refills. AR 214. Notes from this visit say different things about when Plaintiff experienced his last seizure. Compare AR 224 (Plaintiff denied any "interval seizures"), AR 225 (last seizure on March 20, 2014), AR 222 (last seizure in April 2014), and AR 215 (last seizure was "2 weeks ago"). Plaintiff reported that while taking Lamictal, he had one seizure every six months. AR 223, 225. When not compliant with his medication, he experienced one seizure every two or three months. AR 225.

Plaintiff reported that he last took his medication two days prior. AR 216-17. The Olive View staff noted that he was only taking 50 mg of Lamictal "in mistake" instead of 300 mg. AR 215.

Plaintiff did not know then if his VNS was working; it had last been interrogated six years ago. AR 222-23. The Olive View staff referred Plaintiff to

7

neurology to check his VNS. AR 216, 225.

    • <u>August 11, 2014</u>: Consultative examiner Dr. Robert A. Moore conducted a neurological evaluation of Plaintiff. AR 248-54. Plaintiff told Dr. Moore that he "averages four or five [seizures] per month, sometimes more, sometimes less," and that he "routinely takes his medications." AR 248. He reported that the seizures "tend to last less than a minute," during which time he "does not know what is going on around him," but they are "not associated with postictal confusion." <u>Id.</u> Dr. Moore's report contains no discussion of Plaintiff's VNS. It mentions that Plaintiff drove to his appointment. <u>Id</u>. Dr. Moore concluded that since Plaintiff was still experiencing seizures despite medication, he should not do work that requires climbing, balancing, driving or using power tools—essentially the same restrictions in the ALJ's RFC determination. AR 250.

    • <u>October 7, 2014</u>: Plaintiff returned to Olive View for a medication refill. AR 319-20. Notes from this appointment indicate Plaintiff "requires daily medication for control." AR 324. At the time, he was instructed to take 100-mg Lamictal tablets "3 tablets by mouth twice a day." <u>Id.</u>

    • <u>January 2015</u>: Plaintiff told Olive View at a later appointment that in January 2015, a seizure caused him to walk out of his mother's house and be struck by vehicle; he broke his left leg, requiring surgery. AR 282-83. There are no records reflecting this surgery in the administrative record.

    • <u>March 31, 2015</u>: This was the last day of Plaintiff's DIB insured status. AR 17, 156-59.

    • <u>May 8, 2015</u>: Plaintiff returned to Olive View telling them he had been "out of medication for 6 mo[n]ths." AR 313. He reported that his "last seizure [was] yesterday, but attributes this to decreased sleep." AR 311. He "[o]therwise denies any increase in seizure activity." <u>Id.</u> He received a refill of his Lamictal prescription, and again was instructed to take three 100-mg tablets twice daily. AR 316.

8

• <u>June 10, 2015</u>: About a month later, Plaintiff returned to Olive View. AR 291. This time, he told the medical staff he was experiencing three or four seizures per day over the last six months, which the clinic noted contrasted with "prior notes." <u>Id.</u> About two or three times each day, his seizures caused him to engage in abnormal behavior he could not remember afterwards, such as leaving the house naked, taking popcorn from strangers at the movie theater, and touching women's breasts. <u>Id.</u> He gave the staff a letter from his mother describing this (but the letter is not in the administrative record). <u>Id.</u> Plaintiff told the staff that he was not experiencing seizures at a higher rate; rather, he realized that he had been experiencing seizures more frequently than he previously thought after he moved in with his mother and she told him her observations. <u>Id.</u> His mother's note reported that Plaintiff had suffered facial injuries from his seizures, but Plaintiff told Olive View "he gets a rug burn on his face from falling about once a year, generally in the setting of missing his medications or over exercising." <u>Id.</u> At this appointment, the medical staff interrogated Plaintiff's VNS and found it to be at the end of its service life. AR 293.

• <u>June 22, 2015</u>: Plaintiff underwent an electroencephalogram ("EEG") to measure and record electrical activity in his brain. AR 286, 289-90. The test showed "a focal hyperactivity of left temporal lobe which may be the initiating focus of his GTC's [generalized tonic-clonic seizures]." AR 286. The test assessment concluded, "Long-term EEG monitoring should be entertained to investigate this if further medical therapy and replacement of the VNS fail to control his seizures and fugue states." <u>Id.</u>

• <u>July 7, 2015</u>: Plaintiff underwent a computerized tomography ("CT") scan of his brain. AR 332. The scan did not reveal any abnormalities. <u>Id.</u>

• <u>July 21, 2015</u>: At an Olive View appointment, Plaintiff reported that he was still experiencing three or four seizures per day, and his last seizure occurred at 8:00 that morning. AR 282. Treatment notes reflect that an "e-consult to USC for

evaluation of a new VNS as well as long-term EEG monitoring at USC planned last time did not go through ...." Id. Also on this date, Dr. Christopher Degiorgio of Olive View drafted a letter on Plaintiff's behalf indicating that "despite adequate treatment [he] still suffers debilitating seizures multiples times a day." AR 255.

- August 11, 2015: Later treating notes reference an Olive View appointment on this date. AR 276; 281. Treatment notes state that Plaintiff failed to keep an appointment at USC for a surgical consultation about his VNS. AR 281. The administrative record does not contain any records showing that his VNS unit was replaced.

- September 2, 2015: At an Olive View appointment, Plaintiff reported that he had had four seizures since August 11, 2015, despite medical compliance. AR 276. The notes recorded this as an improvement, because he had been "[p]reviously having seizures daily." Id. Plaintiff was offered a referral for mental health treatment, but he declined it. AR 278.

- October 14, 2015: At an Olive View appointment, Plaintiff reported that he was having seizures 2-3 times per day, but his last seizure was 2 days ago in the bus. AR 274. The notes say that "on last visit his L[a]mictal and [K]eppra dosage have been increased but still he is experiencing the GTC seizures." Id.

- February 23, 2016: Plaintiff reported to the Olive View Emergency Room that he had "no meds x 4 mo." AR 260. His last seizures were "today and yesterday," and he wanted a medication refill. Id.

- March 31, 2016: Plaintiff again had "an abnormal EEG due to left temporal slowing and left temporal sharps," consistent with "a focal seizure disorder." AR 344.

- April 20, 2016: Plaintiff underwent another brain CT scan. AR 342. This scan showed "encephalomalacia within the gyrus recti, bilaterally and greater on the right. This lies in a location typical for sequelae of trauma and correlation with

clinical history recommended."[2]  AR 342-43.

- <u>May 20, 2016</u>:  At the administrative hearing, Plaintiff testified that he had seizures "two to three times a day," but sometimes "more or less."  AR 43.  He later testified that it was "never really less."  AR 48.  He testified that he had seizures with that same level of frequency his whole life since he was diagnosed with a seizure disorder at age nine.  AR 44-45.  He later testified the frequency was getting worse since 2009 or 2010.  AR 47-48.  He initially testified that he had "always" been compliant with his medication, but he later explained that when he lost his insurance benefits, he did not have his medications until he learned about the clinic at Olive View.  AR 45-46.

## V.

## DISCUSSION

**A.  Issue One:  The ALJ's Evaluation of Plaintiff's Testimony.**

**1.  Rules for Evaluating Subjective Symptom Testimony.**

It is the ALJ's role to evaluate the claimant's testimony regarding subjective pain or symptoms.  See Molina v. Astrue, 674 F.3d 1104, 1112 (9th Cir. 2012).[3]  "[T]he ALJ is not required to believe every allegation of disabling pain, or else

---

[2] "Encephalomalacia" is a softening of brain tissue, usually associated with a traumatic injury or restricted blood flow.  See https://en.wikipedia.org/wiki/Cerebral_softening.  The "gyrus recti" refers to a portion of the brain's frontal lobe.  See https://en.wikipedia.org/wiki/Straight_gyrus.

[3] On March 16, 2016, the Social Security Administration ("SSA") published Social Security Ruling 16-3p, 2016 SSR LEXIS 4 ("SSR 16-3p"), which eliminated use of the term "credibility" from SSA sub-regulatory policy.  SSR 16-3p was republished on October 25, 2017 with the revision that the ruling was "applicable on March 28, 2016."  See 82 Fed. Reg. 49462, 49468 & n.27 (Oct. 25, 2017).  Here, the ALJ issued her opinion on June 23, 2016, such that SSR 16-3p was in effect.  AR 12-26.  The Ninth Circuit recently noted that SSR 16-3p is consistent with its prior precedent.  Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (SSR 16-3p "makes clear what [Ninth Circuit] precedent already required").  Accordingly, citation to earlier case law is appropriate.

11

disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." Id. at 1112 (internal quotation marks omitted). An ALJ's assessment of symptom severity is entitled to "great weight." Weetman v. Sullivan, 877 F.2d 20, 22 (9th Cir. 1989).

If an individual alleges impairment-related symptoms, the ALJ must evaluate those symptoms using a two-step process. First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" Treichler v. Comm'r of SSA, 775 F.3d 1090, 1102 (9th Cir. 2014) (quoting Lingenfelter, 504 F.3d at 1036) (internal quotation marks omitted). If so, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the degree of symptom alleged." Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).

Second, if the claimant meets the first test, the ALJ may discredit the claimant's subjective symptom testimony only upon making specific findings that support the conclusion. Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010); see also 20 C.F.R. §404.1529(c)(1) ("When the medical signs or laboratory findings show that [a claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [his or her] symptoms, such as pain, [the Commissioner] must then evaluate the intensity and persistence of [the claimant's] symptoms …."). If the ALJ finds testimony as to the severity of a claimant's pain and impairments is unreliable, then the ALJ must make findings "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002); Brown-Hunter v. Colvin, 806 F.3d 487, 493 (9th Cir. 2015). Absent a finding or affirmative evidence of malingering, the ALJ must provide "clear and convincing" reasons for rejecting the claimant's testimony. Lester, 81 F.3d at 834; Ghanim v. Colvin, 763 F.3d 1154, 1163 & n.9 (9th Cir. 2014).

In assessing the intensity and persistence of symptoms, the ALJ must consider a claimant's work record, observations of medical providers and third parties with knowledge of claimant's limitations, aggravating factors, functional restrictions caused by symptoms, effects of medication, and the claimant's daily activities. Smolen, 80 F.3d at 1283-84 & n.8; SSR 16-3p, 2016 SSR LEXIS 4, at *10 ("[The Commissioner] examine[s] the entire case record, including the objective medical evidence; an individual's statements …; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record."). "Although lack of medical evidence cannot form the sole basis for discounting pain testimony," ALJs may consider that factor in their analysis. Burch, 400 F.3d at 681. ALJs may also consider inconsistency in the claimant's statements. Ghanim, 763 F.3d at 1163; SSR 16-3p, 2016 SSR LEXIS 4, at *21 ("[The Commissioner] will compare statements an individual makes in connection with the individual's claim for disability benefits with any existing statements the individual made under other circumstances.").

If the ALJ's findings are supported by substantial evidence in the record, courts may not engage in second-guessing. Thomas, 278 F.3d at 959.

### 2. The ALJ's Evaluation of Plaintiff's Testimony.

The ALJ accepted that Plaintiff has a seizure disorder, but found that Plaintiff's statements concerning the "intensity, persistence and limiting effects" of his seizures are "not entirely consistent with the medical evidence and other evidence of record …." AR 20. Instead, the ALJ found Plaintiff had "exaggerated" the severity of his disorder. AR 21.

The ALJ gave several reasons for this finding. First, he cited the fact that "the claimant has given inconsistent statements regarding his regular compliance with his anti-seizure medications and the frequency and intensity of his seizures." AR 21. Second, the ALJ found "there is no indication the claimant's seizure condition negatively impacts his ability to care for himself, perform household

13

chores, daily activities, and other such activities." Id. The ALJ cited Plaintiff's ongoing volunteer work teaching martial arts to children, saying "[p]resumably, if the claimant was so fearful of his seizures and their impact on his ability to function and be around others, he would not engage in such a strenuous physical activity such as martial arts requiring close, physical contact with others, particularly children." Id. Third, the ALJ found that Plaintiff's testimony was inconsistent with his medical records. AR 20.

### 3. The ALJ Gave Clear and Convincing Reasons for Finding Plaintiff's Testimony Inconsistent with the Evidence of Record.

a. Reason One: Plaintiff's Inconsistent Statements.

The record supports the ALJ's finding that Plaintiff made inconsistent statements regarding his compliance with taking his anti-seizure medication. See SSR 16-3p, 2016 SSR LEXIS 4, at *21 ("[The Commissioner] will consider the consistency of the [claimant's] own statements."). At the hearing, he testified that he had been compliant with his prescriptions since learning that he could refill them at the Olive View clinic. AR 45-46. His first treating records from Olive View are from July 2013. AR 341. His next treating records are from March 2014, at which time he stated he was "out" of his anti-seizure medication and been without it for about 1½ weeks. AR 235. In April 2014, he advised that between 2012 and 2014, he was only taking Lamictal "sporadically." AR 226. In June 2014, he stated he had gone two days without medication, and the Olive View staff determined he was mistakenly taking a dosage that was too low. AR 215-17. In May 2015, he had been out of medication for six months, AR 313, and in February 2016, he reported to the emergency room that he had "no meds x 4 mo[nths]." AR 260.

The record also supports the ALJ's finding that Plaintiff made inconsistent statements regarding the frequency of his seizures. At the hearing, he testified he had experienced two or three seizures every day since 2009 or 2010. AR 43-44, 47-48. In July 2013, however, he told his doctors that he experienced seizures only

once a month or once a week, depending on his medication compliance. AR 340-41. On March 13, 2014, he identified his last two seizures as occurring on March 5, 2014, and about one month earlier. AR 235. In April 2014, he reported that he had one seizure every two or three months. AR 226. In June 2014, he made varying statements about his most recent seizures, but regardless of which account is accepted, they had occurred either weeks or months earlier. AR 215, 222, 224-25. When he saw Dr. Moore in August 2014, he reported averaging four or five seizures a month. AR 248. In May 2015, he denied any increase in seizure activity. AR 311. By that point, his insured status for DIB had already lapsed in March 2015.[4] AR 17, 156-59. Finally, in June 2015, he reported having three or four seizures per day over the past six months, despite his earlier statements. AR 291.

Plaintiff's medication compliance and the frequency of his seizures are both key facts when considering whether his seizure disorder is disabling. The ALJ did not error by citing Plaintiff's inconsistent statements on these topics as a reason to find he was exaggerating the disabling effects of his seizures.

      b.    <u>Reason Two</u>: Inconsistency with Plaintiff's Activities.

Plaintiff testified that he still volunteers teaching martial arts. AR 50-51. He teaches three or four-hour classes at Team Karate Centers with students age six to eight. AR 51, 53. When asked how he could do this while suffering from a seizure

---

[4] Plaintiff asserts that "medical records since March, 2014 support Plaintiff's testimony that he experienced multiple seizures despite medication compliance." (JS at 19.) No medical records created between March 2014 and the March 2015 expiration of Plaintiff's DIB insured status, however, support Plaintiff's testimony that he experienced multiple seizures every day even when taking his medication. That is the timeframe relevant to the ALJ's decision. <u>Tidwell v. Apfel</u>, 161 F.3d 599, 601 (9th Cir. 1998) ("To be entitled to disability benefits, Appellant must establish that her disability existed on or before [the] date [her insured status expired].").

disorder, he responded that he makes sure he gets enough sleep the nights before he teaches. AR 52. Plaintiff testified, however, that even when he gets enough sleep, he still has two or three seizures every day. Id. When the ALJ asked how he could safely be responsible for children despite the possibility of having a seizure while leading a class, he responded, "I don't know. I mean I can, though." AR 52.

Plaintiff testified that he has experienced seizures while teaching martial arts, but he could not estimate how many. AR 53-54. He confirmed that he sometimes acts oddly while having seizures, such as taking off his clothes or touching people inappropriately, but this has not prevented him from volunteering with kids. AR 57. He testified that when he has a seizure while teaching, he "can just sit down" and "zone out" for about thirty seconds. AR 53. When the seizure ends, he "just go[es] back to the regular thing of teaching." Id.

Plaintiff argues that his seizure disorder is "episodic" in nature, such that his testimony that he has multiple seizures every day, during which he can engage in bizarre behavior, is not inconsistent with his ability to care for himself, perform household chores, and teach martial arts to children. (JS at 21.) While Plaintiff's seizure disorder is clearly episodic, the relevant question is whether it precludes him from working. The ALJ did not err in reasoning that if his seizures are not so frequent that they preclude him from caring for his mother and teaching martial arts, then they should not preclude him from working as stock clerk or bagger. Ghanim, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."); see 20 C.F.R. 404.1529(c)(3); 416.929(c)(3).

    c.  Reason Three: Lack of Corroborating Medical Records.

Plaintiff argues that his irregular EEG tests in June 2015 and March 2016 along with his CT scan in April 2015 all corroborate his testimony. (JS at 19.) Each of these tests was conducted after Plaintiff's last insured date in March 2015, and Respondent contends that they establish only that Plaintiff suffers from a

1   ///

seizure disorder without shedding light on the frequency or severity of his seizures. (JS at 12.)

In June 2015, Plaintiff reported a dramatic increase in the number of seizures he was experiencing, i.e., from a few over the course of a months to a few every day. Compare AR 248, 313 and AR 291. The ALJ properly considered that the EEG scans in 2015 and 2016 showed no changes in Plaintiff's condition that would account for his testimony that his seizure activity dramatically increased. AR 20. Both EEG scans revealed abnormalities, but essentially the same abnormalities. Compare AR 286, 289-90 and AR 344.

The ALJ also correctly reasoned that if Plaintiff were truly experiencing multiple seizures every day, one would expect to see medical records for his resulting injuries. AR 20. For example, Plaintiff testified that he fell down some stairs and along a "wash" while jogging and "was in blood" (AR 43), he was kicked and punched by a bus passenger and left in the street by the driver after he touched a woman's breast (AR 58), he fell getting off the bus and was taken to Northridge Hospital (AR 235), and he walked out of his house into the street where he was struck by a vehicle, causing him to have surgery for a broken leg. AR 282-83. There are no treating records corroborating any of this in the administrative record. The ALJ did not err in citing this fact as a reason to discount Plaintiff's testimony.

**B.    Issue Two:  Listing 11.03.**

     **1.    The ALJ's Step Three Analysis.**

Neurological Listing 11.03 (in effect on the date of Plaintiff's disability application and through the date of the ALJ's decision), provided as follows: "Epilepsy-nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and

transient postictal manifestations of unconventional behavior or significant interference with activity during the day." (JS at 4; Program Operations Manual System, DI 34131.013 "Neurological Listings from 12/15/04 to 09/28/16," available at https://secure.ssa.gov/poms.nsf/lnx/0434131013 (last visited January 10, 2018).)

The ALJ found that Plaintiff's seizure disorder did not satisfy Listing 11.03 because it "has not resulted in the requisite documented episodes of seizures occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment …." AR 19.

**2. The ALJ's Step Three Analysis is Free of Legal Error.**

Plaintiff argues that after March 2014, Olive View "medical records indicate that the frequency of Plaintiff's seizures further increased to three to four per day, despite medication compliance. (AR 274, 276, 282, 289, 291, 345)." (JS at 4.)

In fact, the cited 2015 records do not so indicate. AR 274 (on 10/14/15, Plaintiff reported seizures "2-3 times a day" but his last seizure was "2 days ago"); AR 276 (on 9/2/15, Plaintiff reported "4 seizures since last neuro clinic" on 8/11/15); AR 282 (on 7/21/15, Plaintiff reported "3-4 seizures a day," but a planned "e-consult" for VNS evaluation "did not go through"); AR 289 (6/22/15 EEG results note that Plaintiff is reporting "three to four daily" seizures); AR 291 (6/10/15 appointment at which Plaintiff reported "3-4 seizures per day" but also learned that his VNS was no longer working and that seizures cause him to fall "about once a year, generally in the setting of missing his medications or over exercising"). In May 2015, Plaintiff stated to his doctors that he had been "out of medication for 6 months," AR 313, and he stated again in February 2016 that he had "no meds x 4 mo[nths]." AR 260. Thus, even in 2015, Plaintiff was neither taking his prescribed medication daily, nor did he have a functioning VNS. As discussed above, the only evidence that Plaintiff ever experienced 3-4 seizures a day is his own reporting, and the ALJ gave clear and convincing reasons for finding

18

1 | that he was exaggerating.

The ALJ's finding that Plaintiff's seizures did not occur before the expiration of his insured status with sufficient frequency, despite medical compliance, to satisfy Listing 11.03 is supported by the record. AR 235 (Plaintiff ran out of medication in March 2014); AR 216-17 (Plaintiff missed two days of medication in June 2014); AR 313 (Plaintiff was out of medication for six months in 2014-2015); AR 223-25 (while taking Lamictal, Plaintiff reported one seizure every six months).

**C.  Issue Three:  The ALJ's RFC Determination.**

**1.  Rules for Determining a Claimant's RFC.**

A claimant's RFC is "the most" that a claimant can do despite his limitations. 20 C.F.R. § 404.1545(a). It is "based on all the relevant medical and other evidence in [the] case record." Id.; see Batson v. Comm'r of SSA, 359 F.3d 1190, 1197-98 (9th Cir. 2003). The ALJ must consider the total limiting effects caused by medically determinable impairments and the claimant's subjective pain. Garrison v. Colvin, 759 F.3d 995, 1011 (9th Cir. 2014) (citing 20 C.F.R. § 416.920(e)). The RFC need not parrot the opinion of any particular doctor, but rather, "the ALJ is responsible for translating and incorporating clinical findings into a succinct RFC." Rounds v. Comm'r of SSA, 807 F.3d 996, 1006 (9th Cir. 2015); see also Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1174 (9th Cir. 2008).

**2.  The ALJ's RFC Determination is Free of Legal Error.**

The VE testified that if an individual would be off task "two or three times a day," and during that time the individual might be engaged in bizarre, inappropriate behavior, then there would be no work for that individual. AR 63. Plaintiff argues that the medical evidence establishes that this hypothetical describes him, such that the ALJ erred in not including these limitations in his RFC determination. (JS at 31 ["the ALJ's RFC finding did not account for the effects of episodes of bizarre inappropriate behavior associated with seizures …"].)

Here, the ALJ reasonably accounted for Plaintiff's seizure disorder by

including appropriate seizure precautions in his RFC, such as prohibitions against climbing and driving. AR 19. These restrictions were supported by the opinion of examining neurologist, Dr. Moore. AR 250.

The ALJ was not required to account for occasional episodes of bizarre behavior claimed by Plaintiff, because Plaintiff did not provide evidence of these episodes beyond his own testimony, which the ALJ appropriately discounted, as discussed above. Plaintiff did not, for example, provide statements from his mother, anyone at Team Karate Centers, or his prior employer, Home Depot. "Because Plaintiff's alleged limitations were not supported by the record, the ALJ did not err by not including them in the RFC." Nettles v. Colvin, 12-cv-9670-JPR, 2014 U.S. Dist. LEXIS 12512, at *41 (C.D. Cal. Jan. 31, 2014) (citing Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005)).

## VI.
## CONCLUSION

For the reasons stated above, IT IS ORDERED that judgment shall be entered AFFIRMING the decision of the Commissioner denying benefits.

DATED: January 16, 2018

*Karen E. Scott*

_____
KAREN E. SCOTT
United States Magistrate Judge